***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The parties were subject to the Workers' Compensation Act at the time of the alleged injury and/or occupational disease and an employer-employee relationship existed between them. The above-designated carrier was on the risk at the time of the injury, alleged or otherwise.
4. The employee's average weekly wage on the alleged date of onset of May 31, 2002, was $1,048.18, which yields the maximum compensation rate for 2002 of $654.00.
5. The plaintiff last worked for the defendant-employer on or about December 20, 2002.
 ********** ISSUES
1. Whether the plaintiff sustained a compensable occupational disease;
2. If so, what are the compensable consequences; and
3. If the plaintiff did sustain a compensable occupational disease, is the plaintiff's claim otherwise time-barred by N.C. Gen. Stat. § 97-58.
 *********** EVIDENTIARY RULING
The plaintiff's motion to supplement the record with the memo from Allen Lunsford was denied by the Deputy Commissioner, which is hereby upheld by the Full Commission. All other *Page 3 
objections to testimony in depositions are ruled upon in accordance with the applicable law and the findings and conclusions set forth in this Opinion and Award.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was fifty-eight years old at the time of the hearing before the Deputy Commissioner. The plaintiff worked as a construction superintendent at C.D. Williams Construction Company. He began his job in 1990 and worked until December 20, 2002. He stopped working on that date when he began having trouble walking due to bilateral foot numbness.
2. The plaintiff contends that his peripheral neuropathy was caused by arsenic poisoning, incurred in handling "wet" chemically-treated lumber, in the course of his employment with C.D. Williams Construction. Specifically, the plaintiff claims that he suffered arsenic poisoning while working on a construction project building an addition onto an existing building at Coastal Lumber Company (the "Coastal project"). The plaintiff did not wear any gloves or mask, but worked with lumber every day sawing, routing, and sanding. Some of the lumbar was chemically treated, while most was not treated.
3. Charlie Williams, owner of C.D. Williams Construction Co., acknowledged that the lumber for the Coastal project came from Coastal Lumber, and that the chemically-treated wood was "wet." However, treated lumber was used only for the plate of the foundation and areas exposed to the elements, including the deck and two cupolas on the roof. The majority of the project did not require the use of treated lumber. The framing and the interior of the building *Page 4 
did not require treated lumber since it would not be exposed to the elements or pests, and white (untreated) lumber was used. Chemically-treated wood is more expensive than untreated wood.
4. The top plate of the foundation took one-half day to construct, the porch took two to three weeks to construct, and the cupolas took three weeks total to construct. The construction of the top plate of the foundation would have been performed at the beginning of the project, the porch would have been constructed in the middle to end of the project, and the cupolas would have been one of the phases of the project.
5. Based on timesheets, the start date for the Coastal project was around October 17, 1999. The plaintiff began working on this project the week of October 23, 1999. The last time spent to any degree thereafter on the project was the week ending April 29, 2000. Timesheets also confirm that Mr. Williams and the plaintiff were both at the job site on a daily basis. Since the plaintiff was a superintendent, he was not always working hands-on with the lumber, and spent some time each day in the office to direct and organize the work of subcontractors hired by C.D. Williams for the Coastal project, as well as to meet with the client to ensure ongoing satisfaction.
6. Mr. Williams estimated that the amount of sawdust collected from all the sawing, routing, and sanding of pressure treated lumber on the project was two 5-gallon buckets per day. As to the work environment, the cutting was all done outside and there was no burning that he could recall.
7. All of the employees who worked on the Coastal project are still employed with C.D. Williams. No employee of C.D. Williams has ever filed a workers' compensation claim for arsenic poisoning or chemical exposure. *Page 5 
8. Tom Evans, president of Coastal Treated Lumber Products (a division of Coastal Lumber Company), has a degree in forestry with an emphasis in wood technology. Mr. Evans confirmed that since Coastal manufactures pressure treated lumber, all of the pressure treated wood used on the Coastal project was supplied by Coastal. He estimated that the amount of lumber provided by Coastal to Williams Construction for the addition was approximately 8,000 board feet, or one-half of a truck load of lumber. Any plywood used on the project would have been provided by another supplier since Coastal does not manufacture treated plywood.
9. Lumber is treated at Coastal with Osmose brand CCA. According to the materials safety data sheet (MSDS) for Osmose brand CCA, which is kept on file at Coastal, CCA consists of a solution of copper, chromium, and arsenic. Osmose arrives at Coastal in concentrated form. It is immediately transferred into an underground tank at the plant. Prior to use, Coastal dilutes the CCA concentrate in an enclosed mix tank to form a solution of 98% water and 2% CCA.
10. The water/CCA solution is then applied to "white" lumber in a pressure tank. After 20 minutes in the tank, the treated wood is transferred to an outside area known as "the pad," where the lumber is placed on racks to dry for three days, per government regulations. Any excess solution is allowed to drip off onto the pad, where it runs back inside the tank for reuse. After the three day drying process, the finished treated lumber is transferred to the outdoor lumber yard, where the lumber is stored in inventory until sold. The lumber remains in inventory an average of four months before it is sold. The lumber in Coastal's yard is no different than that which is sold at Lowe's, 84 Lumber, or Moore's. While the lumber is in the yard, it may be exposed to rainwater and once wet, may stay wet for days or weeks, depending on the weather. *Page 6 
11. Coastal has conducted air testing for arsenic in the past. The air quality studies identified the arsenic exposure to be well below the OSHA/PEL standards for arsenic exposure both during treatment in the tank and on the pad. The MSDS for Osmose brand CCA also identified independent epidemiology studies that concluded that workers exposed on a daily basis to Osmose CCA solution were at no increased risk of death or disease as a result of exposure.
12. The EPA has never issued regulations against the use of pressure treated lumber. CCA is still used to treat lumber for non-residential uses. Due to the availability of an arsenic alternative, CCA is no longer used to treat lumber for residential use. OSHA never issued regulations for the use of CCA, but did limit the permissible exposure levels for arsenic.
13. The plaintiff's family physician is Dr. Mahendra S. Patel with Halifax Medical Specialists. On March 21, 2000, the plaintiff first presented to Dr. Patel with complaints of occasional bilateral hand and left forearm weakness. Dr. Patel was concerned about possible compression neuropathy and discussed with the plaintiff a referral to neurologist, and EMG testing. However, the plaintiff indicated the weakness didn't bother him that much, and declined further evaluation.
14. The plaintiff returned to Halifax Medical Specialists on November 9, 2000, and was seen by Dr. Amir, a partner of Dr. Patel. The plaintiff complained that he had been hurting in both hands and both feet for the last few days. The plaintiff returned to Dr. Patel on May 24, 2001, with complaints of pain in different joints, including the shoulder and knee.
15. On February 20, 2002, the plaintiff saw Dr. Patel for bilateral hand and foot numbness and back pain. At this time, Dr. Patel referred the plaintiff to Dr. Majmundar, a neurologist. Dr. Majmundar saw the plaintiff on February 28, 2002, for bilateral foot numbness *Page 7 
and big toe lesions. Dr. Majmundar took a history from the plaintiff, and the plaintiff reported that he had experienced worsening numbness in both feet for several years. Dr. Majmundar diagnosed peripheral neuropathy, recommended a Doppler arterial study, EMG nerve conduction study, and laboratory work.
16. The EMG was performed March 8, 2002, and suggested severe sensory motor polyneuropathy with evidence of chronic denervation. Dr. Patel referred the plaintiff to Dr. Bjarnason for management of his feet, and to UNC Hospital for a muscle and nerve biopsy.
17. On May 1, 2002, Dr. Colin D. Hall, a specialist in neurovascular disease at UNC Hospital, performed the muscle and nerve biopsy. The pathologist found severe axonal neuropathy. The biopsy revealed moderately severe peripheral neuropathy, the cause of which was not evident. Neither the pathologist nor Dr. Hall could determine the etiology of the plaintiff's neuropathy based on the biopsy results.
18. The plaintiff continued to see Dr. Amir at Halifax Medical Specialists from June 5 through July 1, 2002, for severe neuropathic foot ulcers. On July 15, 2002, a culture from the plaintiff's foot revealed fungal infections and Dr. Patel referred the plaintiff to Dr. Fiorilli for treatment. The plaintiff saw Dr. Fiorilli at Halifax Medical Specialists for the first time on July 16, 2002 for treatment of his onychomycosis, ulcers, and calluses.
19. The plaintiff returned to Dr. Hall on August 19, 2002, for a consultation regarding his neuropathy. The plaintiff reported a ten-year progressive history of numbness and tingling in his feet. Dr. Hall's record also indicates that the plaintiff reported bilateral leg swelling with open ulcers on his great toes for the past year. From Dr. Hall's record, there is no indication that there was any discussion with the plaintiff about exposure to arsenic from the CCA treated *Page 8 
lumber. As he testified, Dr. Hall could not determine the etiology of the plaintiff's neuropathy, and could not offer a treatment that would reverse his symptoms.
20. Thereafter, the plaintiff resumed treatment with Dr. Patel and Dr. Fiorilli. The plaintiff underwent a urine test on July 29, 2005, which did not detect any arsenic. He also underwent a blood test on June 14, 2005, which showed 6 micrograms per liter of arsenic. The laboratory limits for normal exposure ranged from 2 to 23 micrograms per liter of arsenic.
21. On August 16, 2005, Dr. Fiorilli spoke with the plaintiff and the plaintiff's attorney regarding possible arsenic exposure. Dr. Fiorilli at that time assessed "peripheral neuropathy which may be multifactoral in its etiology." Dr. Fiorilli mentioned possible diabetes or B12 deficiency as contributing factors, although it appears from the record that the plaintiff has not been assessed as diabetic. Dr. Fiorilli went on to state that whether the arsenic could have been a causative or contributing factor in the development of the plaintiff's neuropathy would need to be determined by an expert toxicologist and specialist in occupational medicine since "this is outside of the field of internal medicine."
22. Dr. Fiorilli's testimony shows that there was "no clear cut etiology" for the plaintiff's problems. Even after the May 2002 biopsy, Dr. Fiorilli was not able to determine the cause of the plaintiff's problems. Dr. Fiorilli testified that the plaintiff's peripheral neuropathy could be multifactoral in origin and that there were a number of things that could have caused the plaintiff's condition, including a vitamin B-12 deficiency, heredity, and the plaintiff's gammopathy (overproduction of antibodies), or the condition could be idiopathic. Although Dr. Fiorilli testified that the plaintiff's condition could be arsenic-related, he admitted he had very little experience in dealing with arsenic cases and that he would defer to a neurology specialist, *Page 9 
such as Dr. Hall, or a toxicologist, such as Dr. Charles, in determining whether the plaintiff's peripheral neuropathy was due to arsenic poisoning.
23. As an expert neurologist, Dr. Hall testified that there are numerous causes of neuropathy, including heredity, drugs, organ involvement, cancer, inflammatory disease, abnormal antibodies in the blood, infectious diseases, storage diseases, and toxic factors. He pointed out that in many cases the cause of neuropathy is idiopathic. In the plaintiff's case, Dr. Hall could not find anything contributing to the plaintiff's axonal neuropathy. In fact, per Dr. Hall's testimony, the only clues to the etiology of the plaintiff's condition were the abnormal blood protein levels, or gammopathy. In only about twenty percent of cases can the physician determine the etiology for nerve damage and, according to Dr. Hall, "uncertainty is the rule rather than the exception" with regard to the etiology of axonal neuropathy.
24. Despite taking a full history, which included questioning pertaining to exposure to heavy metals such as arsenic, Dr. Hall testified that the first he had heard about the plaintiff's alleged arsenic exposure was when he first spoke with the plaintiff's attorney before his deposition. Dr. Hall noted that patients exposed to arsenic will develop systemic problems within days of exposure, including nausea, vomiting, rashes, and lack of appetite, and that severe neurologic features follow rapidly, including pain, numbness, and sensory loss. The plaintiff's presentation was "very far" from what he would expect for arsenic poisoning.
25. The greater weight of the evidence shows that the plaintiff's symptoms worsened gradually over a period of years. The plaintiff's symptoms were more similar to the more common presentation of an axonal neuropathy of slow onset, the cause of which is not diagnosable. Dr. Hall knew of no medical literature documenting the development of neuropathy as a result of chronic, low level exposure to arsenic. Dr. Hall does not know of *Page 10 
anyone, including any of his patients, who developed neuropathy as a result of chronic, low-level exposure to arsenic, and he could not give an opinion as to the cause of the plaintiff's neuropathy.
26. Dr. Jeffrey M. Charles, PhD, MBA, DABT, is a board certified toxicologist who reviewed the plaintiff's medical records and conducted a study of the reasonable, worst-case estimate of the amount of arsenic to which the plaintiff could possibly have been exposed while working on the Coastal project. Dr. Charles used two methods for his testing: first, he calculated a dose reconstruction, using actual data from the Coastal jobsite; second, he compared the exposure level he calculated with EPA and ATSDR (Agency for Toxic Substances and Disease Registry) standards.
27. According to Dr. Charles' first method, the plaintiff's maximum worst-case exposure was 0.8 micrograms/kilogram of body weight per day. Dr. Charles' methodology in calculating this amount included the chemical properties of the type of arsenic used in the CCA solution, the maximum amount of wood the plaintiff could have possibly handled on a daily basis for a four week period, the absorption rate for arsenic into the skin based on EPA standards, and the plaintiff's weight.
28. Under his second method of calculating the amount of arsenic to which the plaintiff may have been exposed on the Coastal project, Dr. Charles determined that the plaintiff could have been exposed to 0.35 micrograms/kilogram of body weight per day, which is less than the amount the first approach yielded. Dr. Charles' methodology for the second approach was based on exposure rates derived from two large-scale studies by the CADHS and MEDHS of workers who handled chemically treated lumber. *Page 11 
29. EPA standards for no observable adverse effect level (NOAEL) of arsenic exposure are 15 micrograms per kilogram of body weight per day (0.015mg/kg), and the Agency for Toxic Substances and Disease Registry (ATSDR) standard is 5 milligrams per kilogram of body weight (0.005 mg/kg). One milligram equals 1,000 micrograms. The plaintiff's potential exposure of 0.8 micrograms/kilogram of body weight/day is well below the safe exposure levels recognized by EPA and ATSDR.
30. Per Dr. Charles' testimony, arsenic in the range of 70 to 180 milligrams can cause death, and a dose of 30 to 50 milligrams (30,000 micrograms/kilogram of body weight/day) could cause peripheral neuropathy. However, the plaintiff's maximum exposure would not have been harmful. Further, Dr. Charles reviewed the plaintiff's medical records and did not note the presence of any other symptoms of exposure to arsenic.
31. The Full Commission finds Dr. Charles' testimony regarding the possible exposure rates, as well as the methodology and results of his studies, which are included in his report, to be credible and competent on the issue of levels of exposure and toxic effects of arsenic. Both approaches used by Dr. Charles show that the amount of arsenic to which the plaintiff could have been exposed in his handling of lumber in his employment was not harmful according to EPA and ATSDR standards.
32. Arsenic exists naturally in soil, ground water, and food supplies in the environment, and there are multiple natural sources for arsenic exposure. Natural sources of arsenic include food sources such as crops, fish, poultry, and beef, and drinking water from either municipal or well sources. People may routinely be exposed to 4 to 5 micrograms of arsenic per liter of water. There are water sources in North Carolina that contain up to 20 *Page 12 
micrograms of arsenic per liter. The World Health Organization acknowledges that a safe level of arsenic in drinking water is 10 micrograms of arsenic per liter of water.
33. With regard to potential arsenic exposure via dermal contact with treated lumber, the risk to even young children from exposure to residues on treated lumber used on playgrounds is so small that the EPA determined that there is no need to regulate existing playgrounds containing arsenic treated wood. Dr. Charles agreed with the EPA's conclusions in this regard.
34. The blood and urine analysis done for the plaintiff in June and July 2005 were insufficient to establish prior arsenic exposure. The half-life for arsenic is about ten hours, so within ten hours, half the arsenic absorbed by the body is excreted through the urine. The plaintiff's samples would not be helpful in determining exposure since they were taken at least five years after the alleged exposure.
35. There is insufficient evidence of record to show that the plaintiff had sufficient exposure to arsenic in his employment to cause arsenic poisoning. The plaintiff has never truly been diagnosed with arsenic poisoning. According to both Dr. Charles and Dr. Hall, other than neuropathy, the plaintiff did not show any signs or symptoms of toxic exposure to arsenic. Rather, the plaintiff's ten-year history of gradual onset of numbness and tingling in his hands and feet show that the etiology of the plaintiff's neuropathy was more consistent with the common presentation of a peripheral neuropathy with a slow onset, the etiology of which is unknown.
36. In assessing the possibility of the plaintiff's arsenic exposure, the Full Commission assigns greater weight to the testimony of Dr. Hall and Dr. Charles, specialists in their respective fields of neurology and toxicology, than the testimony of Dr. Fiorilli, especially since he deferred to the expertise of such specialists. The greater weight of the evidence fails to establish that the plaintiff's employment created a toxicologically significant exposure to arsenic *Page 13 
in the lumber he handled. Where the plaintiff was exposed to levels of arsenic below and well within the EPA and ATSDR standards, the evidence further fails to show that he has developed peripheral neuropathy or other arsenic poisoning due to such exposure to arsenic.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff failed to meet his burden of proving that his employment exposed him to toxicologically significant levels of arsenic, significant enough to cause arsenic poisoning or other adverse physical effects. N.C. Gen. Stat. § 97-53.
2. The greater weight of the evidence fails to establish that the plaintiff's exposure to arsenic in his employment caused his development of peripheral neuropathy and ulcers on his feet, or any other alleged arsenic poisoning. N.C. Gen. Stat. § 97-53; Moore v. J.P. Stevens Co., 47 N.C. App. 744, 269 S.E.2d 159, cert. denied, 301 N.C. 401, 274, S.E.2d 226 (1980); Click v. Pilot Freight Carriers, 300 N.C. 164, 167,265 S.E.2d 389, 391 (1980).
3. The plaintiff has failed to prove that he sustained the onset of a compensable occupational disease on or about May 31, 2002, and his claim for benefits must be denied. N.C. Gen. Stat. § 97-53.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following: *Page 14 
 AWARD
1. The plaintiff's claim for compensation relating to his alleged occupational disease must be, and is hereby, DENIED.
2. Each side shall pay their own costs, and the defendants shall pay all expert witness fees, if not paid by prior order.
This 23rd day of April 2007.
S/______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1